UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
IN RE ENFORCEMENT OF RESTRAINING  )
ORDERS ISSUED BY THE HIGH COURT OF  )
ENGLAND AND WALES, QUEEN'S BENCH  )
DIVISION, UNITED KINGDOM, AND THE    )
CROWN COURT OF ENGLAND WALES,        )
UNITED KINGDOM                                       )        **UNDER SEAL**
                                                              )        No. _____
                                                              )
_____

**UNITED STATES' EX PARTE APPLICATION TO ENFORCE AND REGISTER
FOREIGN RESTRAINING ORDERS PURSUANT TO 28 U.S.C. § 2467(d)(3)
AND STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Applicant United States of America, by and through its undersigned attorneys, respectfully submits this application for entry of two foreign restraining orders pursuant to 28 U.S.C. § 2467(d)(3), as amended by the Preserving Foreign Criminal Assets for Forfeiture Act of 2010. This application seeks to enforce (i) a restraining order issued by the High Court of England and Wales, Queen's Bench Division ("High Court") in connection with the criminal prosecution of James Onanefe Ibori; and (ii) a second restraining order issued by the Crown Court of England and Wales ("Crown Court") in connection with the prosecution of Bhadresh Gohil. Each of these orders have been certified for enforcement in the interests of justice by the Assistant Attorney General of the United States Department of Justice's Criminal Division in accordance with 28 U.S.C. § 2467(d)(3) and (d)(3)(B)(ii). The United States seeks the restraint of certain assets in the United States due to the involvement of the assets and the United Kingdom ("U.K.") defendants who beneficially control them in an international money laundering scheme that is being prosecuted and investigated by Her Majesty's Crown

1

Prosecution Service and the Metropolitan Police Service of the United Kingdom of Great Britain and Northern Ireland (collectively "Crown"). Because both orders arise out of a single investigation by the Crown and are based upon closely related facts, the United States seeks enforcement of both British restraining orders in this application.

## I.     JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2467. Venue is proper in this Court pursuant to § 2467(c)(2)(B), which provides, in relevant part, that "venue shall lie in the district court for the District of Columbia or in any other district in which the defendant or the property . . . may be found."

## II.    APPLICATION

The United States seeks issuance of a restraining order pursuant to § 2467(d)(3) to enforce two British restraining orders. In November 2011, the United States received a mutual legal assistance request from the United Kingdom seeking enforcement of these orders for the purpose of securing U.S.-based assets believed to represent the proceeds of an international money laundering scheme orchestrated by (1) James Onanefe Ibori ("Governor Ibori"), former governor of Nigeria's Delta State and (2) Bhadresh Gohil ("Gohil"), Governor Ibori's former English solicitor (collectively "U.K. Defendants"). The United States, with the appropriate certification of the Assistant Attorney General annexed hereto as Exhibits A and B, applies to this Court to issue the proposed restraining order giving effect to the following two British restraining orders:

(1) Restraint Order, attached to Exhibit A, issued by Justice Peregrine Charles Hugo Simon of the High Court against the assets of Governor Ibori on June 3, 2008, as it pertains to real property located at 931 Enclave Lake Drive, Houston, Texas 77077

      ("Houston Property");  and

(2) Restraint Order, attached to Exhibit B, issued by Judge Martin Beddoe of the Crown Court against Gohil's assets on November 17, 2008, as it pertains to brokerage accounts numbered 1CA-07411 and 1CA-07246, held in the name of Parabola International ("Parabola"), at Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Accounts") in New York, New York.

### III.   FACTUAL BACKGROUND

Governor Ibori served as the governor of Nigeria's oil-rich Delta State from 1999 to 2007.  Nigeria's Constitution prohibits state governors from maintaining foreign bank accounts and serving as directors of private companies.  Governors are also required to disclose all of their assets to the national government.  As governor, Governor Ibori reported that his salary was approximately £12,000 pounds sterling ("GBP"), or around $18,681, and that he possessed no cash or bank accounts outside of Nigeria.  The Crown investigation revealed that these statements were false.

Governor Ibori and his associates misappropriated millions of dollars in Delta State funds and laundered those proceeds through a myriad of shell companies, intermediaries, and nominees in the United Kingdom.  Governor Ibori, with the active assistance and participation of Gohil, fraudulently diverted and misappropriated millions of dollars in Delta State funds to various businesses he controlled through his relatives and associates.

#### A.   <u>Governor Ibori and  Okoronkwo</u>

The Crown's investigation revealed that Governor Ibori and his former mistress and business associate Udoamaka Okoronkwo ("Okoronkwo") conspired and executed jointly

3

numerous schemes to misappropriate Delta State funds.[1] These funds were used by the Governor and Okoronkwo to purchase assets, including properties in the United Kingdom and the United States, as well as to pay for personal expenses. Governor Ibori abused the powers of his office to award lucrative and inflated state contracts to businesses owned or controlled by his family and associates.

In 2005, for instance, the Delta State Ministry of Youth and Sports (the "Ministry") provided public funds to Onovin Nigeria Ltd. ("Onovin"), a business controlled by Governor Ibori's sister Christine Ibori-Ibie ("Ibori-Ibie").[2] Delta State awarded Onovin a contract to build a running track at Oghara Stadium. Governor Ibori and Okoronkwo fraudulently misappropriated some of these state funds for their personal use. Onovin was paid more than 96 million naira (Nigerian currency) by the Ministry in February 2005. Ibori-Ibie transferred these funds amounting to more than £300,000 GBP to a Barclays account in her name in London. Although approximately £123,000 GBP was remitted to a German contractor to build the track, Governor Ibori retained more than £175,000 GBP (approximately $268,641) for his personal use. These funds were then funneled to an HSBC account in the name of Governor Ibori and another account in the name of another shell company called Independent Newspapers, whose sole signatory was Okoronkwo, and was used primarily to pay for Governor Ibori's day-to-day living expenses in the United Kingdom.

In 2006, Governor Ibori awarded another Delta State contract for the purchase of four armored Range Rover vehicles to Rivvbed, Ltd., another company owned by Okoronkwo. The

---

[1] Okoronkwo was also charged and convicted of money laundering in the United Kingdom on June 7, 2010. She was sentenced to five years imprisonment. In addition, an order of confiscation was issued against Okoronkwo in the sum of £2,649,959 GBP.

[2] Ibori-Ibie has been also charged and convicted of money laundering in the United Kingdom in connection with Governor Ibori's criminal schemes.

Crown investigation revealed that Okoronkwo fraudulently inflated this contract by nearly $1 million USD. Indeed, although Okoronkwo purchased five Range Rovers from High Protection Company, a Georgia-based dealer, for $666,215, she kept one of the Range Rovers for her personal use. In addition, the profit margin on this state contract was more than $900,000 (i.e., approximately 60 percent of the contract's value).

Similarly, Governor Ibori's special assistant Adebimpe Pogoson ("Pogoson") deposited approximately $2 million of Delta State funds in cash and drafts into various Nigerian bank accounts held in her name in 2004 and 2005. These funds were electronically transferred to a Barclays account in the U.K. in the name of M.E.R. Engineering ("MER"). Pogoson served as MER's director and was the sole signatory on this account. The Crown investigation revealed that Governor Ibori, who also served as an MER director until 1999, remained the beneficial owner of MER's assets and accounts, and continued to manage actively MER's operations while serving as Delta's governor. MER's bank account received more than £2.2 million GBP (approximately $3.4 million) in deposits between 2004 and 2007, most of them from two oil companies operating in Nigeria. These oil companies rented barges from MER in Nigeria. In 2004 and 2005, approximately $1.44 million in the MER account was funneled into a Swiss bank account at Private Bank AG Geneva in the name of Stanhope Investments Ltd., another shell company controlled by Governor Ibori. Funds from the Stanhope account were used in April 2005 to acquire, among other things, Governor Ibori's armor plated Maybach 62 in South Africa, which cost approximately £275,000 GBP (approximately $422,159).

### B. **Governor Ibori and Gohil**

Governor Ibori used a web of shell companies and intermediaries in multiple jurisdictions to open dozens of bank accounts to launder and conceal the proceeds of his corruption. Gohil, an

English solicitor, was Governor Ibori's professional money launderer.  Gohil assisted the Governor and his associates form shell companies, access financial institutions, and conceal the proceeds of their collective criminal conduct on four different continents.

For example, African Development Finance Ltd. ("ADF"), a company formed by Gohil in 2005, was retained by Nigerian states—Delta and Akwa Ibom—for services related to those states' efforts to divest their state-owned shares in V Mobile, a Nigerian phone company.  ADF was paid $37,820,873 in fraudulent consulting fees.  In reality, ADF performed little, if any, real work, as both states had already lined up investors to purchase their V Mobile shares.  Under contracts awarded to ADF by Delta and Akwa Ibom, ADF was entitled to receive a flat fee of 5 percent of the value of the V Mobile stock sale.  In addition, even though both states had already received offers from investors to purchase their V Mobile shares for $7.58 per share, Delta and Akwa Ibom States agreed to pay ADF a commission for any V Mobile shares sold to investors in excess of  $6.50 per share.  In May 2006, both states sold their V Mobile securities at a share price of $7.60.  ADF, in turn, collected $19 million in fees from Delta State and $18 million in fees from Akwa Ibom State.  These funds were deposited into Access Bank in Nigeria. Gohil was instrumental in directing these funds to various offshore accounts.  Particularly, $10 million was funneled through several bank accounts, including (i) one controlled by a close business associate of Governor Ibori, (ii) an account opened in the  name of Gohil's law firm, and—ultimately—to (iii) three different accounts in the names of various shell companies in Singapore and Hong Kong controlled by Gohil.

Similarly, in April 2005, Gohil incorporated—at Governor Ibori's direction—Teleton Quays Ltd. in the British Virgin Islands to purchase a £298,895 GBP ($465,323) property in England, for Governor Ibori.  The Crown investigation showed that this property was purchased

so that Governor Ibori would have a residence near the Port Regis private school, where his children were students. Okoronkwo provided a bank check to Gohil for £311,000 GBP (approximately $484,166) to purchase this property drawn on her personal HSBC bank account held in her name in the U.K.

In addition to Teleton Quays, Gohil helped Governor Ibori use Parabola International Corp. ("Parabola"), a company Gohil formed in Mauritius, to launder his criminal proceeds. Governor Ibori and Gohil funneled money from MER into various accounts in Switzerland held in the name of Parabola. As explained above, MER received substantial revenue from oil companies operating in Nigeria.

Gohil also assisted Governor Ibori gain access to British banks and permitted Governor Ibori to use his law firm's accounts to receive, deposit and send money. In May 2005, for instance, Gohil permitted Governor Ibori to funnel $850,000 through Ken Oil & Gas, a Nigerian firm, into a client bank account controlled by Gohil's law firm. These funds were then used to pay Governor Ibori's personal bills in the United Kingdom, including the private school tuition of Governor Ibori's children and the salary of his family chauffer in the United Kingdom. Similarly, in March 2007, Gohil opened an account in the name of Theresa Ibori, Governor Ibori's wife, at American International Depository and Trust Private Bank. Gohil, again, maintained power of attorney over funds in this account. Approximately $499,000 was funneled through this account to pay for Governor Ibori's personal expenses, including his utility bills, various legal bills, and the private school education of his children.

C. **Status of the Crown Investigation**

During the course of the Crown's investigation, British authorities identified millions of dollars in assets acquired by the U.K. Defendants in multiple jurisdictions scattered across the

world, including the United States. In order to preserve the availability of these assets for forfeiture under U.K. law, the Crown sought and obtained restraining orders against the assets of the U.K. Defendants. The operative language in the British orders is nearly identical. They direct the U.K. Defendants not to "in any way dispose of, deal with, or diminish the value of any of [their] assets whether they are in or outside of England and Wales." The orders apply to each Defendant's assets, including "any asset which [he or she has] the power, directly or indirectly, to dispose of or deal with as if it were [his or her] own."

In November 2011, the Crown submitted a supplemental Mutual Legal Assistance Request ("the Request") to the United States pursuant to a treaty between the United States and the U.K., which obligates both states to provide mutual legal assistance in investigations, prosecutions, and other proceedings, including confiscation and the immobilization of assets.[3] The Request seeks enforcement of the British restraining orders against assets owned and/or controlled by the U.K. Defendants in the United States. According to the Request, these assets are the proceeds of money laundering by the U.K. Defendants.

The Crown—working in cooperation with Homeland Security Investigations ("H.S.I."), an agency of the United States Department of Homeland Security—uncovered approximately $3.2 million in real and personal property acquired by the U.K. Defendants in the United States. Specifically, Governor Ibori purchased the Houston Property for $1.815 million in 2007, and Gohil opened the Merrill Accounts in New York in 2000.

---

[3] *See* Instrument as Contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union Signed 25 June 2003, as to the Application of the Treaty Between the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters Signed 6 January 1994, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. 109-13 (2006) [hereinafter the Instrument as Contemplated by the U.S.-EU Treaty]; *see also* Treaty with the United Kingdom on Mutual Legal Assistance on Criminal Matters, U.S.-U.K., Jan. 6, 1994.

### (1) Houston Property

In November 2007, Governor Ibori acquired, with no mortgage, a house at 931 Enclave Lake Drive, Houston, Texas 77077, for $1.815 million.[4] The property is titled in MER's name and is appraised currently at $1.7 million.[5] Governor Ibori personally signed the purchase contract for the home and Chieudu John Ebie, Governor Ibori's English barrister, signed the closing documents on his behalf.

### (2) Gohil's Merrill Accounts

In January 2000, Gohil opened accounts 1CA-07411 and 1CA-07246 at Merrill Lynch (now part of Bank of America Corp.), in the name of Parabola. Gohil has sole signature authority on these accounts. The Crown Court restraining order applies explicitly to any assets owned or controlled by Gohil, which would include both Merrill Accounts.

### D. U.K. Defendants Convicted

On June 7, 2010, Okoronkwo was convicted on three counts of money laundering. The Crown Court—following Okoronkwo's conviction—sentenced her to five years imprisonment and issued a confiscation order in the sum of £2,649,959 GBP ($4,125,473). Gohil was also convicted in November 2010 of money laundering and prejudicing a money laundering investigation, and in December 2010, pleaded guilty to an additional eight offenses related to the V Mobile fraud. Gohil was sentenced to ten years imprisonment. The Crown is presently

---

[4] On April 22, 2009, the High Court issued a Variation Order clarifying the June 8, 2008, Restraining Order so as to explicitly (i) identify the Houston Property as being restrained under the June 8, 2008, Restraining Order, and (ii) identify MER as a party covered under the Restraining Order with respect to the Houston Property.

[5] The Crown investigation showed that Governor Ibori admitted (i) in 2002 to RBC Trustees (Guernsey), Ltd. to have business interests in various companies, including MER; (ii) in 2004 to Privatbank that he was a major shareholder in MER; and (iii) in February 2004 to Barclays Bank that he owned several companies, including MER.

seeking post-conviction confiscation against Gohil's assets. Governor Ibori pleaded guilty to money laundering and conspiracy to defraud on February 27, 2012. On April 18, 2012, Governor Ibori was sentenced to thirteen years imprisonment. The Crown is currently seeking post-conviction confiscation of Governor Ibori's assets.

## IV. LEGAL AUTHORITY

Pursuant to 28 U.S.C. § 2467(d)(3), United States federal courts are authorized to issue orders to preserve property during the pendency of foreign forfeiture proceedings until receipt of an enforceable final foreign forfeiture judgment. *See* Preserving Foreign Criminal Assets for Forfeiture Act of 2010, Pub. L. No. 11-342, 124 Stat. 3607 (codified as amended in 28 U.S.C. § 2467(d)(3)).[6] In issuing such an order, a U.S. court may either rely on information from an affidavit "setting forth a reasonable basis to believe property to be restrained will be named in a judgment of forfeiture" or it may register and enforce a foreign order. 28 U.S.C. § 2467(d)(3)(B). Section 2467(d)(3)(A) provides:

> [t]o preserve the availability of property *subject to civil or criminal forfeiture under foreign law*, the Government may apply for and the court may issue a restraining order at *any time before* or after *the initiation of forfeiture proceedings by a foreign nation*.

§ 2467(d)(3)(A) (emphasis added).

Section 2467(d)(3)(A) also requires that the U.S. restraining order be issued "consistent with subparagraphs (A), (C), and (E) of subparagraph [(d)]1) and the procedural due process

---

[6] On December 22, 2010, through the Preserving Foreign Criminal Assets for Forfeiture Act of 2010, Pub. L. No. 111-342, 124 Stat. 3607 (2010), Congress amended 28 U.S.C. § 2467(d)(3) partly in response to case law limiting courts' authority under the prior iteration of the statute to freezing assets only after a foreign court had entered a final forfeiture judgment. *See, e.g.*, *In re Any and All Funds or Other Assets in Brown Bros. Harriman & Co. Account # 8870792 in the Name of Tiger Eye Inv. Ltd.*, 613 F.3d 1122 (D.C. Cir. 2010). As amended in late 2010, the statute now clearly authorizes courts to issue a restraining order "at any time before or after the initiation of forfeiture proceedings by a foreign nation." 28 U.S.C. § 2467(d)(3)(A)(i) (2006 & 2012 Supp.).

protections for a restraining order under section 983(j) of title 18." 28 U.S.C. § 2467(d)(3)(A). Consequently, the district court may deny enforcement of a foreign restraining order if it finds that the order was obtained without due process, was issued by an authority that lacked subject matter jurisdiction, or was obtained by fraud. In addition, the cross-references to § 983(j) do not require that forfeiture proceedings, civil or criminal, be filed in the U.S., but rather refer to actions and proceedings initiated in the foreign country. As a result, consistent with analogous procedures in a domestic civil or criminal forfeiture proceeding under § 983(j), U.S. Courts may issue an order fashioning the appropriate relief to preserve property during the pendency of foreign proceedings.

A prerequisite for the enforcement of a foreign restraining order is certification by the Attorney General that enforcement of the order is in the "interest of justice." 28 U.S.C. § 2467(b)(2). On March 9, 2006, the Attorney General delegated authority for the certification of orders under this provision to the Assistant Attorney General for the Criminal Division. *See* Ex. C.

V.     **DISCUSSION**

   A.     **The British Restraining Orders Meet the Requirements for Enforcement Under § 2467(d)(3)(A).**

Section 2467(d)(3) sets forth the following criteria relevant in considering a request for enforcement of a foreign restraining order: (1) whether the United States and the foreign government issuing the order are or will become parties to a formal international agreement providing for mutual forfeiture assistance; (2) whether the acts underlying the violation of foreign law giving rise to forfeiture would give rise to forfeiture under federal law if such acts were committed in the United States; (3) whether the Attorney General has determined it would be in the interest of justice to certify the order for enforcement; (4) whether the foreign order was

issued consistent with due process; (5) whether the foreign authority had subject matter jurisdiction to issue the restraint; and (6) whether there is any reason to believe the foreign order was obtained by fraud.[7] The certified British restraining orders meet the requirements for registration and enforcement pursuant to § 2467(d)(3) and, therefore, entry of the proposed U.S. restraining order is both necessary and appropriate to preserve the property for eventual forfeiture in the U.K.

### 1. Agreement on Forfeiture Assistance

First, the United States and the U.K. are parties to a bilateral mutual legal assistance treaty ("MLAT") from 1994. Article 1 of the 1994 MLAT contains a non-exhaustive list of legal assistance items available under the Treaty. Requests for assistance concerning the identifying, tracing, freezing, seizing and forfeiting of criminal proceeds are specifically envisioned. *See* Treaty with the United Kingdom on Mutual Legal Assistance on Criminal Matters, art. 1, U.S.-U.K., Jan. 6, 1994. The MLAT further provides that "[t]he Courts of the Requested State shall have authority to issue subpoenas, search warrants, *or other orders necessary to execute the request*." Id. at art. 5 (emphasis added). Article 16 of the Instrument as Contemplated by the U.S.-E.U. Treaty supplements the MLAT by adding a new article on "Assistance in Forfeiture Proceedings," which clarifies that "The Parties shall assist each other in proceedings involving . . . forfeiture of the proceeds and instrumentalities of crime and in relation to proceedings involving the imposition of fines related to a criminal prosecution." *See* Instrument as Contemplated by the U.S.-E.U. Treaty, U.S.-U.K., art. 16, Jan. 6, 2004. Accordingly, the first

---

[7] In issuing the requested restraining order, this Court need not make explicit findings regarding due process, a foreign authority's subject matter jurisdiction, or the absence of fraud in the foreign proceedings. See 28 U.S.C. § 2467. Instead, these factors constitute grounds upon which an affected party affirmatively may challenge enforcement of the foreign order. Nonetheless, as set forth herein, such a challenge would lack merit.

criterion for enforcement is satisfied because the United States and the U.K. are parties to agreements authorizing forfeiture assistance.

### 2. Dual Forfeitability

Second, the underlying criminal conduct of the U.K. Defendants would also have violated U.S. criminal laws giving rise to forfeiture had those offenses been perpetrated here. Specifically, the U.K. Defendants' actions—if committed in the United States—would have violated 18 U.S.C. §§ 1956 and 1957 (money laundering), which gives rise to forfeiture under U.S. law. *See* 18 U.S.C. § 981(a)(1)(A) (civil forfeiture for property involved in, or traceable to, a money laundering transaction); § 982(a)(1) (criminal forfeiture of property involved in or traceable to a money laundering violation).

Under U.S. law, money laundering to promote unlawful activity, to conceal the source, origin, nature, ownership, or control of criminal proceeds, or with the intent to evade reporting requirements or evade taxes, is a crime for which forfeiture is available. See 18 U.S.C. § 1956(a) (criminalizing money laundering); § 981(a)(1)(A) (establishing civil forfeiture for property involved in, or traceable to, a money laundering transaction).

The Crown's indictment and conviction of Governor Ibori was premised upon allegations that he engaged in a conspiracy to defraud states within the Nigerian Federation and a conspiracy to make false instruments. Gohil was indicted and convicted for laundering the proceeds of Governor Ibori's criminal schemes. Each of these offenses, if committed in the United States, would constitute specified unlawful activities ("SUAs") for the purpose of the federal money laundering statute. *See* 18 U.S.C. § 1956(c)(7) (listing specified unlawful activities). These SUAs include, inter alia: 18 U.S.C. § 641 (theft of public money or property); § 666 (theft or bribery concerning programs receiving federal funds); § 1341 (mail fraud); and § 1343 (wire

fraud). See 18 U.S.C. § 1956(c)(7). Such offenses would give rise to proceeds and money laundering forfeiture under 18 U.S.C. § 981(a)(1)(A) and (C). The U.K. crimes for which the U.K. Defendants have been convicted, if committed in the United States, would give rise to forfeiture here, as they do in the United Kingdom, thus satisfying the second criterion for enforcement of a foreign restraining order.

### 3. Attorney General Certification

Third, the British restraining orders were certified by the Assistant Attorney General on April 6, 2012. The Assistant Attorney General, in certifying the foreign restraining orders, acknowledges that he has considered the facts of the case, the foreign law, the applicable U.S. law, and the circumstances of the judiciary from whence the order came, and has concluded that enforcement of the British restraining orders under § 2467 is "in the interest of justice." *See* Exhibits A & B. The Attorney General's Order of March 9, 2006, delegates authority to sign § 2467 certifications to the Assistant Attorney General. *See* Exhibit C, Order No. 2820-2006. The Assistant Attorney General's determination is a statutory requirement for enforcement of a forfeiture order and is not subject to review. *See* 28 U.S.C. § 2467(d)(3)(B)(ii) and § 2467(b)(2). Thus, the third criterion for enforcement is met.

### 4. Due Process

Fourth, the British restraining orders were issued consistent with due process. The High Court restraining order issued against Governor Ibori by Justice Simon was issued pursuant to the U.K.'s Criminal Justice Act of 1988 ("CJA"). The restraining order against Gohil was issued by the Crown Court under the U.K.'s Proceeds of Crime Act ("POCA"). To obtain a restraining order under both the CJA and POCA, the Crown is required to show that: (i) proceedings against the defendants for a specific offense have been instituted and remain pending, and (ii) reasonable

cause exists to believe that the proceedings may result in defendants being convicted of an offense from which they may have benefitted.

Here, the owners of the assets that the Crown seeks to restrain were provided with notice of the restraining orders and apprised of their rights under U.K. law to apply to the appropriate court to vary or discharge any of the orders partially or entirely.  Specifically, the Crown provided explicit and direct notice of the Defendants' rights under U.K. law to challenge or modify the restraining orders to both U.K. Defendants, as well as to (i) Teleton Quays Ltd., Stanhope Investments, Erin Aviation Ltd., and MER in connection with Governor Ibori's assets; and (iii) Gohil's ex-wife and Parabola International Ltd., in connection with Gohil's assets.

A final judgment of confiscation cannot be entered in the U.K. until the defendant is convicted and the Crown demonstrates affirmatively what, if any, economic benefit a defendant obtained as a result of, or in connection with, his or her criminal conduct.  These proceedings afford Defendants a full trial on the merits; a chance to examine and contest the Crown's witnesses and evidence; and a meaningful opportunity to challenge the forfeiture action.

The British restraining orders are *in personam* orders entered against the U.K. Defendants, rather than in rem orders limited to specific assets.  Even though the orders do not explicitly restrain some of the U.K. Defendants' U.S. assets—namely the Merrill Accounts controlled by Gohil, they are enforceable against the U.K. Defendants individually.  The British restraining orders explicitly prohibit the U.K. Defendants from disposing or selling any assets in their name or controlled by them, wherever located.  Likewise, even though the Merrill Accounts controlled by Gohil were opened in 2000, which predates his charged criminal conduct in the U.K., the restraining order is enforceable against him personally, as it is intended to preserve any of his assets that may become subject to post-conviction confiscation by the Crown.  As

amended, Section 2467(d)(3) expressly provides authority for U.S. courts to enforce foreign restraining orders issued in connection with foreign criminal or civil forfeiture proceedings. See 28 U.S.C. § 2467(d)(3)(A)(ii)(II)(aa).[8]

### 5. Subject Matter Jurisdiction

Fifth, the restraining orders were issued by courts of competent jurisdiction. POCA provides that applications for restraining orders should be filed with the Crown Court, rather than the High Court, if a defendant's criminal offenses commenced *after* March 24, 2003. Because Governor Ibori's criminal conduct reaches as far back as 1999, the High Court had jurisdiction to issue the restraining order against his assets. Gohil's alleged misconduct, on the other hand, commenced *after* March 24, 2003. As such, the Crown Court was the appropriate venue to seek a restraining order against his assets. Accordingly, the fifth criterion is also met because the relevant restraining orders were issued by the appropriate U.K. courts.

### 6. Absence of Fraud

Finally, the United States is not aware of any reason to believe that the British orders were obtained by fraud. As such, ample justification exists for the registration and enforcement of the British orders in the United States.

---

[8] Section 2467 does not require exact duplication of the specific procedural requirements of U.S. law. Instead, the statute states that the procedure must be "consistent with . . . the procedural due process protections for a restraining order under section 983(j) of title 18." 28 U.S.C. § 2467(d)(3)A)(ii)(I). U.K. procedures for notice and hearing are consistent with U.S. procedures for issuing restraining orders in domestic civil forfeiture actions. *See In re Enforcement of a Restraining Order by the High Court*, 2011 U.S. Dist. LEXIS 104465, at *3 (D.D.C. May 5, 2011) (concluding that an *in personam* restraining order issued by the Hong Kong High Court, a jurisdiction whose laws are based largely on British law, "appears to have been rendered under a system of law compatible with the requirements of due process"). Accordingly, the post-conviction British restraining orders at issue in this case are enforceable.

B.     **This Court Should Act to Enforce the British Restraining Orders by Executing Restraining Orders in a Manner Consistent with § 983(j)(1).**

Section 2467(d)(3)(A) authorizes the district court to enter a restraining order to preserve the availability of property subject to either civil or criminal forfeiture proceedings under foreign law. The statute makes clear that § 983(j) is not to be given literal application, but rather the cross-reference to § 983(j) refer to "the applicable foreign criminal or forfeiture proceedings" in the context of enforcing a foreign restraining order. 28 U.S.C. § 2467(d)(3)(A)(ii)(II)(aa). The British restraining orders reflect the intention of the Crown to seek forfeiture in connection with the criminal prosecution of the U.K. Defendants. The MLAT requests accompanying the British orders state that the purpose of asking the United States to enforce the restraining orders is "to freeze assets within the jurisdiction of the United States of America so that the assets are preserved to satisfy any confiscation order that may be made" in the U.K. against the U.K. Defendants. To guarantee the effectiveness of future confiscation (forfeiture) by the Crown, the U.K. courts are authorized to employ provisional measures, such as these restraining orders, while the case is prosecuted to prevent the dissipation of the proceeds of unlawful activity.

Consequently, applying the language of § 2467(d)(3)(A) and structures under § 983(j)(1)(A), this Court possesses the authority to issue an order –consistent with the British restraining orders—to "preserve the availability of property . . . subject to forfeiture" for the duration of the U.K. proceedings. *See* § 2467(d)(3)(A) (specifying that the district court may enter a restraining order at <u>any time before or after</u> the initiation of foreign forfeiture proceedings) (emphasis added). As such, this Court should recognize the British orders and enforce them according to their terms. *See* Exhibits A & B.

## VI.    CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court

enforce the attached British restraining orders, consistent with U.S. treaty obligations under its MLAT and the Instrument as Contemplated by the U.S.-E.U. Treaty, by entering the attached proposed order pursuant to this Court's authority under 28 U.S.C. § 2467(d)(3)(A), (d)(3)(B)(ii), and 18 U.S.C. § 983(j)(1)(A). The United States will promptly provide those affected individuals and entities with notice of this proceeding and a copy of the Order, and will request, through the appropriate legal assistance channels, that those individuals and entities located outside of the United States who have an apparent interest in the property be provided with notice and a copy of this Court's Order.

    Respectfully submitted,

    JENNIFER SHASKY CALVERY,
    CHIEF,
    ASSET FORFEITURE AND
    MONEY LAUNDERING SECTION

Date: May 16, 2012    By:_____/s/ Woo S. Lee_____
    DANIEL H. CLAMAN,
    Assistant Deputy Chief
    WOO S. LEE (D.C. Bar No. 486004)
    Trial Attorney
    ELIZABETH ALOI
    Trial Attorney
    U.S. Department of Justice
    Criminal Division
    1400 New York Avenue, N.W., 9th Floor
    Washington, D.C. 20530
    Tel:  (202) 514-1263
    Fax:  (202) 514-5522

    Attorneys for Applicant
    UNITED STATES OF AMERICA